### The Respondent's inability to honor agreements has destroyed the Stipulation's Most Essential Part of the Bargain.

The Respondent made all of the above promises to entice the Petitioner to enter into the Stipulation. The Petitioner relied on and accepted the Respondent's promises despite her previous misconduct. For instance, the Respondent used time and effort, and money, invested by the Petitioner from 2009 to come to a custody agreement, on the same terms of the custody sought in this Petition, and then hiring an attorney under a collaborative agreement to prepare her hostile divorce strategy. [**Exhibit J**] So shown in Exhibit J the Respondent reassured the Petitioner of her commitment to a peaceful resolution of their divorce right before she initiated the most hostile forms of divorce available to her.

The Petitioner understands that this in the past, and does not allow any emotions generated by those event to interfere with the present, but the Respondent refuses to bury the hatchet. The Respondent entered into the contract and swore to it in Court and accepted the extraordinary sum of $95,000 yet immediately continued to deal in anger and cause negativity and melodrama in my and Eva's life that is interfering with the constructive upbringing of the child. [**See Exhibit C and Notices of Defaults in Exhibit C**]

The bargain the Petitioner struck with the Respondent allocated benefits between them intended to be independent of any remedies available under our agreement, including any failure of such a remedy to achieve the bargain's essential purpose of providing peace and security and a healthy full relationship for the child with both parents. From the Petitioner's point of view, this is the most essential part of the deliberately bargained term requiring that there be a civil, respectful parenting relationship.

### The Respondent is the Moneyed and More Affluent Spouse

The Respondent's own filings in the Supreme Court action show that she has access to unlimited financial resources to pay for litigation cost and expenses that far exceed those of the Petitioner. Initially the Respondent retained Judd Burstien, P.C. who charged up to $1,000 per hour and Chemtob, Moss, Forman & Talbert, LLP at rates up to $675 per hour. Each of these attorneys came to court with the highest priced class of associates.

The Respondent filed for divorce in Supreme Court on January 11, 2011. The Final Judgment of Divorce is dated August 13th, 2013. The Petitioner was ONLY represented for 6 of the 32 months during which the Respondent's was advised by both firms mentioned above to conduct her extreme aggressive litigation. The Respondent relied on Richard Min, a 32 year old sole practitioner at an effective hourly rate of less than $100 per hour, a small fraction of the rate charges by Chemtob, Moss, Forman & Talbert, LLP and even less than the charge the Respondent paid for paralegals.

6

The Respondent filed three DRL 236 Statements of Net Worth in the Supreme Court action. In the first, dated February 9, 2011 the Respondent verified having monthly AFTER INCOME TAX expenses of $15,077. The Respondent received $1250 of child support and no martial support during this time.

The Respondent's Statement of Net Worth failed to include traveling expenses. The Respondent filed copies of her passport in the Supreme Court action.

| Trip | Date | Entry/Exit | Country |
|---|---|---|---|
| 1 | 10/21/10 | Entry | Republica Argentina |
|   | 10/23/10 | Exit | Republica Argentina |
|   | 10/24/10 | Entry | USA |
| 2 | 11/23/10 | Entry | St. Maarten |
|   | 12/01/10 | Entry | USA |
| 3 | 12/28/10 | Entry | St. Maarten |
|   | 01/03/11 | Entry | USA |
| 4 | ? | Entry | ? |
|   | 03/15/11 | Entry | USA |
| 5 | ? | Entry | ? |
|   | 05/23/11 | Entry | USA |
| 6 | ? | Entry | ? |
|   | 07/04/11 | Entry | USA |
| 7 | ? | Entry | ? |
|   | 08/30/11 | Entry | USA |
| 8 | ? | Entry | ? |
|   | 11/28/11 | Entry | USA |
| 9 | 02/24/12 | Entry | Istanbul |
|   | 02/28/12 | Entry | USA |
|   | 05/29/12 | Ineligible | Ineligible |
| 10 | 08/07/12 | Entry | Madrid |
|   | ? | Entry | USA |
| 11 | 08/17/12 | Entry | Republica Dominicana |
|   | 08/20/12 | Exit | Republica Dominicana |
|   | 08/20/12 | Entry | USA |

The Respondent's passport was missing five pages. Yet the filing showed constant international travel to Turkey, Argentina, St. Maarteen, Spain, and the Dominican Republic. In addition the Respondent travels extensively. None of the Respondent's three Statements of Net Worth reported any travel expenses. The Respondents luxury leisure traveling continues and has not a single time given Eva to me while she travels.

7

### The Court must consider the Respondent's Deceptive Tactics when considered to grant this motive of contempt and modification.

The Respondent commenced litigation on September 13, 2010 by having the Petitioner arrested on frivolous and entirely fictional baseless charges a scheme she secretly while I was naively anticipating her execution of a stipulation and filing to have a Final Judgment entered that would incorporate a collaborative divorce agreement that the Respondent had executed after conducting lengthy negotiations with joint a collaborative attorney and mediator. *The Respondent's criminal charges were immediately and summarily dismissed.* [Exhibit L]

On February 15, 2011 the Respondent filed a petition on an ex parte basis claiming I had adducted my daughter and seeking an order to have me arrested and to have my visitation rights suspended. The Respondent made this filing in Family Court after having withdrawn her petitions from Family Court in order to file a complaint in Supreme Court with a sworn promise to pursue all her petitions in Supreme Court. *The Respondent's charges were immediately and summarily dismissed and the order that she had obtained were immediately and summarily dismissed.* [Exhibit M]

On September 5th, 2013 the Respondent came to my residence while Eva was with me in accordance to the existing custody agreement to take the Child from me. She used her undeserved protective order to intimate me and took Eva from me. She then called the police and had the child put into a police car and took her to be interrogated. She had recently added new counsel expert in manipulating the state's domestic violence laws. This new counsel used the Respondent's scheme to file a petition to suspense my visitation and petition for me to be criminally charges and arrested. Later the Respondent admitted on the record that she acted in accordance to her lawyer's instruction. *The charges were dismissed, I was not arrested, and the order that she sought was not granted.*

### The Court must also consider the Respondent's record of discarding her written agreements.

The Respondent entered in contracts two (2) separation agreements, confirmed the validity of her prenuptial agreements, executed a retainer with a collaborative attorney, and entered into divorce settlement that included equal time sharing and a full co-custody co-parenting agreement before electing to pursue the actions described above. As noted above, these actions include making filing in Family Court while engaged in litigation in Supreme Court.

Also noted above, the Respondent commenced litigation after she signed a collaborative divorce agreement while the Petitioner relied on her email assurances and was anticipating the filing to have a Final Judgment entered in accordance to the joint a collaborative attorney and mediator. [Exhibit J]

8

The Respondent's past disregard of the child's basic interest in the Petitioner's welfare and existing misconduct towards the Petitioner and child through her violations of the court's order is apparently driven by misdirected anger and a lack of understanding and interest in understanding. The Petitioner cares about the child and the child cares for the Petitioner. The Petitioner grew up witnessing and living with my grandparents and parents, aunts and uncles, and cousins that lived to support each other, their school and church and their community. This is an experience that the Respondent has no interest in living. She has chosen not to work to support herself and devote herself to leisure and travel.

## Adverse unexpected economic changes make the current child support unsustainable thus legal and all litigation are economically unfeasible.

At the time the Petitioner agreed to pay the Respondent $3,000 per month child support his wholly owned company, Asensio & Company, Inc.'s ("ACO"), his only and sole source of personal earnings, had an application pending with the State of New York to become a registered investment advisor. The Petitioner fully anticipated that this application would be granted and had no information or knowledge of law or fact that it would be denied. Approval of the application is as a work around for a bar from association with the FINRA, a private company that is the nation's only self-regulatory organization for securities brokers. The Petitioner was the only dedicated short seller ever to have been a member of FINRA, and thus not merely a minority but a unique member in FINRA that has no supporting or protecting regulations for short sellers from the inherent conflicts between FINRA's non-short selling members. The Petitioner and ACO rely exclusively on short selling for all its revenues. These decisions were not anticipated and the adverse outcomes caused a material negative economic effect on the Petitioner and his business. **[Exhibit K]** The bar and FINRA's regulatory monopoly cut off all of ACO's revenues that are the only source of income for the Petitioner.

The Respondent experienced the conflict between FINRA and ACO from the beginning to the end. The Respondent experienced the drastic change in financial status that resulted from the bar. The Respondent has a full understanding of the time and commitment that the Petitioner put into restoring his relationship with FINRA, and witnessed firsthand the enormous cost and futility of the effort and the depleting effects of the Petitioner's FINRA bar the coincidental timing in the fall of 2008 during the darkest moments of the financial crisis. Approval of the New York application was necessary to fund the $3000 child support payments.

As a result of the above change of circumstances, ACO could not generate earnings, was unable to afford to continue to make office rental payments, was sued by its landlord, and could not continue to pay salaries and the Petitioner had closed ACO's offices. The Order states that pursuant to Section 240 1-b, sub-division (b) (1) of the Domestic Relations Law that the amount allocated to Petitioner for Child support payments is $197.20 per month. The Petitioner has incurred a material adverse economic change as described below. As described above, the Respondent is the more affluent, moneyed spouse.

9

Certificate of Service and Petition

WHEREFORE, Petitioner respectfully requests that the judgment order of the Supreme Court, dated August 13th 2012, filed August 20th, 2013, be modified as set forth above and for such other relief as the Court may deem just and proper hereby certify that on Wednesday, November 19, 2013, I delivered by hand, mailed and email a true, correct and complete copy of this Petition for Enforcement and Modification of Supreme Court Order of Custody and Visitation with its exhibits..

Dated: November 20, 2013

Petitioner

*Manuel P. Ascnsio*

Petitioner's Address and Telephone Number Printed name and address

400 East 54th Street, Apartment 29B

New York, NY  10022

VERIFICATION

STATE OF NEW YORK )

:ss:

COUNTY OF NEW YORK )

being duly sworn, says that (s)he is the Petitioner in the above-named proceeding and that the foregoing petition is true to (his)(her) own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters (s)he believes it to be true.

NICHOLAS L J WILLIAMS
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
REG. #01WI6227866
MY COMM. EXP. 09/07/2014

Sworn to before me this 20

day of November 2013

(Deputy) Clerk of the Court

Notary Public

10

# EXHIBIT 3

F.C.A. §§ 651, 652, 654

**FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**
...............................................................X

In the Matter of a Proceeding for Custody/Visitation
Under Article 6 of the Family Court Act

MANUEL P. ASENSIO

        Petitioner,

    -against-

EMILIE BOSAK

        Respondent
...............................................................X

Docket No. V-43839-13/13A

**AMENDED PETITION FOR MODIFICATION OF ORDER OF CUSTODY AND VISITATION MADE BY SUPREME COURT**

TO THE FAMILY COURT:

    The undersigned Petitioner respectfully shows that:

    1.    I am the father of Eva Asensio. I am seeking to modify the custody provision of a judgment of divorce

    2.    The home addresses of the Petitioner and Respondent are as follows:[1]

        Petitioner: 400 East 54th Street, Apartment 29B, New York, NY  10022

        Respondent: 355 East 72nd Street, Apartment 17C, New York, NY  10022

    3.    Petitioner is the non custodial parent and was the defendant in an divorce action filed in Supreme Court of the State of New York, New York County, Index No. 300317/2011.

    4.    A judgment of divorce dated August 30, 2013, which incorporated a written stipulation dated April 30, 2013, was entered in the action setting forth sole custody to the Respondent and Visitation to Petitioner as set forth in a signed agreement.

A true copy of the judgment and stipulation of settlement is attached and made a part of this Petition, and

---

[1] Unless ordered confidential, pursuant to Family Court Act §154-b, because disclosure would pose an unreasonable risk to he health or safety of the party . See Forms GF-21 and 21a, available at www.nycourts.gov.

are annexed as **Exhibits A** and **B**, respectfully.

    5.    The names, addresses and dates of birth of all children affected by this order are:

| Name | Address[2] | Date of Birth |
|---|---|---|
| Eva Asensio | 355 East 72nd Street<br>Apt 17C<br>New York, NY 10022 | October 14, 2004 |

    6.    Under the terms of the judgment the Supreme Court has not retained exclusive jurisdiction to modify the judgment.

    7.    Since the agreement and entry of the judgment there has been a significant change of circumstances as follows as detailed below.

### Background Facts Prior to the Existing Agreement

    8.    The parties first met in 1997, and moved in together in 2001. In 2003, the parties married. Prior to the marriage, they executed a prenuptial agreement and an amendment to that prenuptial. This petition shall refer to the prenuptial and the amendment simply as "the prenuptial agreement" for the sake of brevity.

    9.    The prenuptial agreement set forth each party's financial obligations. No mention was made about custody or child support as it was made before the child was born.

    10.    The Child Eva Asensio was born in 2004, and from her birth to 2010 the parties made mutual decisions involving her, including but not limited to her schooling, travel, camps, cultural upbringing and future. Eva's religious decisions were made mainly by the Father.

    11.    In 2007 the parties began experiencing marital difficulties and both desired to reach an amicable resolution on all issues. The prenuptial agreement covered the financial aspects and in July 2010 the parties agreed to divorce under New York State Collaborative law. This included a true full co-

---

[2] Unless ordered confidential, pursuant to Family Court Act §154-b, because disclosure would pose an unreasonable risk to he health or safety of the party . *See* Forms GF-21 and 21a, available at www.nycourts.gov.

parenting and equal time sharing custody agreement that reflected the arrangement during the marriage and also reflected the informal arrangement the parties had.

12. The Mother failed to finalize the agreement and instead commenced a Family Court proceeding in December 2010 coupled with a false claim of domestic violence which resulted in the Father being arrested.

13. The Mother then commenced an action in Supreme Court, New York County, seeking to set aside the prenuptial agreement and for sole custody. The Father learned that the Mother had been secretly recording the Father without his knowledge as part of her pre divorce planning.

14. While the Divorce was underway, the Mother filed a violation in Family Court, resulting in an ex parte suspension of the Father's parenting time and an issuing of a warrant for his arrest.

15. The suspension and warrant were vacated when the Father was able to be heard.

16. The Supreme Court then issued a temporary parenting time order, in which residential custody was shared 50-50.

17. In September 2011, the Mother, apparently unhappy with returning to the 50-50 share custody arrangement that had been in place through 2010, changed attorneys and filed an false claim, stating that the Father had abducted the Child. The Supreme Court suspended the Father's parenting time, which was then modified to be supervised visitation.

18. The mother's claims were found to be baseless and the Father's restrictions were removed. However, the 50/50 arrangement was not restored.

19. The Supreme Court conducted a custody trial. At the conclusion of the trial but before a decision was made, the parties reached a global agreement. The Mother dropped her claims of domestic violence and the need for supervised visits. She also waived any future right to challenge the prenuptial agreement. In exchange, the Father paid the Mother significant amounts of money that far exceeded the provisions of the prenuptial agreement. The terms of the prenuptial agreement were also expressly stated to

include matters involving custody and child support, but the Mother stated her interpretation of the prenuptial was different than that of the Father.

20. It was understood that in exchange for the financial settlement, that the Mother would cease interfering with the Father's access to Eva. It was further understood that the parties would act in a mature and civilized fashion, that both parents would have meaningful input to nurture and guide Eva, and foster respect for both parents. The agreement of April 30, 2013 also incorporated by reference the parties prenuptial agreement as amended. The agreement was incorporated by reference into a judgment of divorce dated August 13, 2013.

21. A copy of the judgment is annexed hereto as **Exhibit A**. A copy of the Stipulation is annexed as **Exhibit B**. A copy of the prenuptial agreement and amendment is annexed as **Exhibit C**

### As and for a First Substantial Change of Circumstances
(Improper Sleeping Arrangements)

22. Following the parties' judgment (**Exhibit A**) and agreement (**Exhibit B**) the Mother began a new campaign to separate and alienate the child from her father with greater intensity than before she received her financial settlement. The Mother has violated the spirit and the letter of the agreement. The Mother has placed her own interests ahead of Eva's.

23. At the time of the settlement, Eva had her own bedroom. Since the agreement, the Mother has taken away the Child's bedroom and gave it to a Eva's maternal grandmother. Eva now sleeps in her mother's bed and share the bedroom with her grandmother. There is no reason that Eva should not have her own bed and her lack of a bed is a substantial change of circumstances since the agreement.

### As and for a Second Substantial Change of Circumstances
(Unanticipated Reduction of Parenting Time)

24. The settlement provides that when the Mother is away from the child for more than one night, the Father is to be given first choice to spend time with Eva before the Mother may use a baby sitter, unless Eva's maternal grandmother and aunt are available. Since the agreement, the Mother has allowed the grandmother to move into the home. The Mother now spends significant amount of time away from home and Eva, leaving her in the care of her maternal grandmother. At the time of the agreement, it was understood that if the Mother spends time away from Eva that she would be with her Father. The grandmother's moving into the home was calculated and designed to deprive the Father of parenting time which he would have had under the agreement.

### As and for a Third Substantial Change of Circumstances
(Mother's Routine Adversely Affecting Child)

25. The Mother goes out regularly routinely out to night clubs, parties, or any of her other numerous social activities, and comes home late, which affects Eva's sleep. Even on Wednesday when Eva is with her father and the Mother is absent, she denies the child the peace and stability of staying with the father in her own room.

26. Eva was been late to school 22 times in the 2012-2013 school year. The Mother has claimed that the Father is responsible for six of them. Even if this were true, (a point not conceded), there is no excuse why Eva should be late for 16 times during which she is in the care of her mother. She also has at least two unexcused absences from school, one of which was the Monday before an incident which occurred on December 5, 2013. It is submitted that the Child's lack of proper sleeping arrangements is causing her to be late and absent, which is not in her best interests.

27. Since the agreement, Eva has undergone a dramatic decline in her learning skills and her study habits have deteriorated. She is unable to focus and concentrated on her school work like she used to. The Mother fails to acknowledge that taking away Eva's bedroom and disrupting her sleep schedule has any bearing on her. The Mother blames the Father for Eva's lack of sleep.

28. The Father has attempted to work with the Mother to address Eva's education, but these efforts are rebuffed. Mother will simply hang up the phone in anger. The Father has attempted to intervene on behalf of Eva, but Mother has prevented the Father from making any significant changes, and has made thinly veiled threats to make false claims to have the Father arrested if he attempts to communicate with her about Eva's learning needs. The Mother has placed her own selfish needs and her desire to keep the Father out of Eva's life over the needs of Eva. Such behavior is not in Eva's best interests, and Eva is suffering for it.

### As and for a Fourth Substantial Change of Circumstances
(Mother improperly involving Police)

29. The Mother repeated involved the police during Eva's pick ups and drop offs, teaching the child to associate her father with the need to have police protection, the Mother has done this in front of the child. Eva regularly expresses her concerns about the Mother's use of police in her life.

30. Eva has told the Father that her mother refuses to speak to her about her feelings towards her father and the separations. The child has expressed to the father her sense of resignation at not being able to maintain the closeness at least by telephone that she desires, and she is being forced to use emotional defenses to control the sadness her unwanted situation generates.

31. On December 5, 2013, the Father was speaking to the child's after-school drama class teacher in the presence of the child. The mother appeared to be infuriated, shouting and yelling vile insults at the father in the presence of the child. The Mother called the police and made deceitful and false

allegations against the Father. The Mother's actions caused the Father to be arrested 91 days later on March 6th, 2014.

### As and for a Fifth Substantial Change of Circumstances
(Mother Denying Father Phone Access)

32. The Mother has constantly refused to allow the Father to speak to Eva when she is in her mother's care in accordance with the agreement. The Mother has willfully and repeatedly denied the Father's phone access to Eva.

33. When the parties settled, the Mother agreed to cease her prior behavior of interfering with the Father's parental rights. Since the settlement agreement, the Mother has engaged in denying phone access as part of a new campaign to interfere with Eva and her father.

### As and for a Sixth Substantial Change of Circumstances
(Mother interfering with Child's Religious Beliefs)

34. Prior to 2011, it was agreed that Eva would be raised as a Christian. She is baptized and she identifies herself as a Christian and as a person with traditional Judeo-Christian values. It was also understood when the settlement was reached that Eva would continue the same religious training she had before the divorce. It was the Father's reliance on this understanding was one of many factors in the Father agreeing to the custody stipulation.

35. Following the divorce, the Mother has interfered with the Child's religious beliefs. As part of the Mother's efforts in breaking the bond between Eva and her father, the Mother is now undermining Eva's religious upbringing. The Mother has begun teaching Eva religious views which are contrary to her existing religious views. The child has stated to the Father that "mommy says I don't have to go to church" that it is not important to be a member of a church community and that "mommy says I don't have to

believe in God" and that is it OK not to believe God. The Mother ridicules Eva's enrollment in a religious school and the Father's own religious beliefs in front of Eva. It is not in Eva's best interests to have her religious views and her father's credibility undercut or even changed as part of her mother's campaign to remove every trace of the Father from Eva's life. The mother does not attend church services and has not in the past. The mother has no interest in assisting with Eva's understanding of her religious beliefs, and yet she refuses to provide the father with access so that Eva and her father can share participation in their shared religion. The Mother is effectively changing Eva's views from that of a self identified Christian to that of an atheist.

### As and for a Seventh Substantial Change of Circumstances
(Mother fails to cooperate with Father)

36. Since the agreement, the Mother has denied virtually every request made by the child for additional time with the Father, including additional overnight sleepovers with one sole exception. The exception occurred on December 4th, 2013 when the Mother agreed to allow Eva to stay with her Father. But even this extra time was made in bad faith, as the following day, the Mother changed her mind as to the extra parenting time and called the police claiming there was a violation of an order of protection. See above.

37. Eva should not be forced to live under the shadow of the Mother's never ending plots to manipulate the police domestic violence proceedings and try to have the Father arrested in front of the child. The Mother has a long history of doing so from prior to the agreement and all her claims were discredited when she dropped them when a global settlement that included a financial settlement, was reached. The Mother's commencement of a new campaign to alienate Eva from her Father is a serious, substantial and material change of circumstances that is adversely affecting the welfare and best interests of Eva.

### As and for a Eighth Substantial Change of Circumstances
(Mother has alienated Child from Father and Father's Heritage )

38.  Since the agreement, the Mother has begun a campaign to damage and eliminate Eva's paternal heritage as part of her efforts to undermine the Father's role in Eva's life.  The Father was born in Cuba and he and his family actively maintains their Cuban customs and heritage. The Father is fluent in Spanish as is the Mother. The Mother is fluent in French. The parties agreed to teach Eva Spanish -during the marriage by speaking to her in Spanish at home, which went hand in hand with Eva being exposed to both her parent's background. Since the settlement, the mother speaks to the child exclusively in French and has hired a tutor to teach Eva French. The Mother has prevented Eva from continuing to use the Spanish language. The Mother has ignored the Father's request to enroll the child in Spanish summer camp or classes.

39.  The Father believes that Eva should continue to be taught Spanish, and believes that it remains in Eva's best interests to be multilingual in English, French and Spanish.

40.  Prior to the agreement, and until the Mother prevented Eva from continuing to learn Spanish, Eva could readily converse in Spanish.  Instead of improving her Spanish, her command of the language has substantially decreased. This damages Eva's self identity as a child who is half Cuban and whose father strongly identifies himself with his Cuban heritage.

41.  It was the Father's understanding when the custody agreement was reached, that Eva would continue to be taught Spanish. During the divorce, the Mother threatened to make Eva "unlearn" her Cuban heritage and as a result of the first arrest was able to keep Eva enrolled in a French speaking school instead of moving to Miami where Spanish is the second language, as agreed.  This helped break the ties to her Cuban background. The Mother was so adamant with her threats that it became necessary to include a specific provision in the agreement which prohibits the Mother from enrolling Eva in a French speaking